IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JAMES KNIGHT AND JASON MAYES, | ) |
| Plaintiffs, | ) ) ) |
| v. | )  Case No. 3:20-cv-00922 |
| | )  Judge Trauger |
| THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, | ) ) ) ) |
| Defendant. | ) ) |

**THE METROPOLITAN GOVERNMENT'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The Court should deny Plaintiffs' motion for summary judgment for three reasons. First, the ordinance that Plaintiffs challenge, Metropolitan Code of Laws § 17.20.120 *et seq.* ("the sidewalk ordinance") is not an unlawful exaction that runs afoul of the Fifth Amendment. It is a generally applicable land-use regulation with strong links to valid public policy goals, and it is therefore constitutional under rational basis review. Second, even if the sidewalk ordinance were an exaction, it is constitutional under any applicable standard of review because it is a legislative creation that is reasonably related to the public good it was designed to achieve and the development activities it regulates. Finally, the sidewalk ordinance is constitutional under Plaintiffs' favored standard of review because its purposes bore a nexus and rough proportionality to their specific development activities.

**STATEMENT OF FACTS**

Defendant, the Metropolitan Government of Nashville and Davidson County, adopts and incorporates the statement of facts in the memorandum of law supporting its motion for summary judgment. (Doc. No. 22 at 2-5.) In addition, the Metropolitan Government submits

{N0426919.1}  1

its responses to Plaintiffs' statement of undisputed facts with this response, which will further aid the Court's analysis.

## LEGAL STANDARD

Summary judgment is intended to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmovant must rebut such a showing by presenting sufficient evidence on which the jury could reasonably find for him; "[a] mere scintilla of evidence is insufficient" to meet this burden. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *Id.*

## LEGAL ARGUMENT

### I. THE SIDEWALK ORDINANCE IS CONSTITUTIONAL UNDER ANY APPLICABLE STANDARD OF REVIEW.

Generally applicable land use regulations should stand unless a challenger can show that they are arbitrary and irrational. *E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998). For the reasons presented in the Metropolitan Government's motion for summary judgment (Doc. Nos. 21-23), adopted and incorporated herein, the sidewalk ordinance is a constitutional exercise of municipal power. (*See* Mem. L. Supporting Def.'s Mot. Summ. J., Doc. No. 22 at 6-8.) Specifically, the sidewalk ordinance, as part of Nashville's zoning code, provides for public safety and wellbeing by funding a sidewalk and greenway network that reduces the risk of pedestrian deaths, eases traffic congestion, protects air quality, and raises property values. (*Id.*)

Should the Court find that the sidewalk ordinance is an exaction, the standard of review that Plaintiffs seek does not apply. (*Id*. at 11-20.) Rather, the Court should apply the reasonable relationship test used in several states, including Tennessee, because the sidewalk ordinance is a legislative exaction that applies predetermined conditions to specific development activities in broad areas of the city. (*Id*. at 20-24.) As such, the sidewalk ordinance does not implicate the central concern of administrative exactions, which depends on the "direct link between the government's demand and a specific parcel of real property." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 614 (2013). The ordinance is constitutional under this test because there is a reasonable relationship between its requirements and burdens and the public good it was designed to achieve, as well as Plaintiffs' development activities. (Mem. L. Supporting Def.'s Mot. Summ. J., Doc. No. 22 at 20-24.)

If the Court does not apply the reasonable relationship test, it should instead apply the *Penn Central* test. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005). As outlined in the Metropolitan Government's motion for summary judgment filings, under this test, the sidewalk ordinance is constitutional because its economic impact is small; it does not interfere with investment-backed expectations; and its character is beneficial to property owners. (Mem. L. Supporting Def.'s Mot. Summ. J., Doc. No. 22 at 24-28.)

II.     **THE SIDEWALK ORDINANCE IS CONSTITUTIONAL UNDER *NOLLAN/DOLAN*.**

The Court should find the sidewalk ordinance constitutional under Plaintiffs' requested standard of review, which was developed in *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994). Under this framework, the government "may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a 'nexus' and 'rough

proportionality' between the government's demand and the effects of the proposed land use." *Koontz*, 570 U.S. at 599 (quoting *Nollan*, 483 U.S. at 107, and *Dolan*, 512 U.S. at 374). This is known as the *Nollan/Dolan* test, and it applies to dedications of land as well as money payments. *Koontz*, 570 U.S. at 619.[1]

Out of the gate, Plaintiffs misstate the scope of *Nollan/Dolan*. This test does not apply to "any demand for a permit." (Mem. L. Supporting Pls.' Mot. Summ. J., Doc. No. 19 at 8.) It applies to adjudicative exactions where the government demands land or money in exchange for a permit on a particular parcel of property. (Mem. L. Supporting Def.'s Mot. Summ. J., Doc. No. 22 at 11-17.) As many courts have recognized, the Supreme Court has never extended this special application of the unconstitutional conditions doctrine to legislative exactions such as the sidewalk ordinance Plaintiffs challenge here. (*Id.* at 12-20.)

But even if the Court applies this heightened standard of review, Plaintiffs' claims fail because they took advantage of both the sidewalk ordinance's variance and appeal processes. In those processes, the Metropolitan Government's review effectively amounted to a determination that the ordinance satisfied the requirements of *Nollan/Dolan* as applied to their properties.

### A. There Is A Nexus Between The Ordinance's Requirements And Plaintiffs' Development Activities.

---

[1] *Koontz* is controlling authority, but applying *Nollan/Dolan* scrutiny to permit denials and money payments is not consistent with prior Supreme Court precedent. First, the unconstitutional conditions doctrine as specially applied to takings claims in *Nollan* and *Dolan* should not apply where the government hasn't done anything that violates the constitution, such as in Knight's case, where a permit has not been granted. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 703 (1999). Relevant to Mayes's case, according to the view of five justices in *E. Enters.*, 524 U.S. at 554, money payments do not fall within the ambit of a takings claim. *Compare id.* at 540-47 (Kennedy, J., concurring), with *id.* at 554-58 (Breyer, J., dissenting). *See also* John D. Echeverria, Koontz: *The Very Worst Takings Decision Ever?*, 22 N.Y.U. ENVTL. L.J. 1, 26-27 (2014).

The first step in the *Nollan/Dolan* analysis is to find a nexus between the exaction and the effects of the proposed land use. *Koontz*, 570 U.S. at 599. There is such a nexus in this case because Plaintiffs' proposed development activities were likely to increase population density and traffic, thus increasing the need for sidewalks.

Beginning with the requirement to build and dedicate easements for sidewalks, "an essential nexus exists between development of property abutting public streets and sidewalk dedication." *State By & Through Dep't of Transp. v. Lundberg*, 312 Or. 568, 578 (Or. 1992). More specifically, "[p]edestrians and bicyclists occupying dedicated spaces for walking and/or bicycling . . . remove potential vehicles from streets, resulting in an overall improvement in total transportation system flow." *Dolan*, 512 U.S. at 387-88 (citing sources) (alteration in original). The sidewalk ordinance states that 23 people were killed on Nashville's streets in 2018. (BL2019-1659, Doc. No. 1-2 at 1.) It also notes that one report ranked Nashville the 15th most dangerous region in the country for people walking. *Id.* The NashvilleNext plan cited in the ordinance states that "in communities without complete sidewalk networks . . . pedestrian injuries and deaths are more frequent." (NashvilleNext Vol. V: Transportation, Access Nashville 2040 at 42, available at https://www.nashville.gov/departments/planning/nashvillenext/nashvillenext-plan.) Thus, there is an essential nexus between the sidewalk ordinance's requirement to build sidewalks and public safety as well as traffic mitigation and related benefits such as reduced commuting times and improved air quality.

Turning to the option to pay an in-lieu fee instead of building a sidewalk, such fees are often included in ordinances to allow leeway for property owners. *California Bldg. Indus. Assn. v. City of San Jose*, 351 P.3d 974, 1002 (Cal. 2015). Here, in-lieu fees offer flexibility to property owners with hardships that hinder sidewalk construction while advancing the same public interests described above. These fees must be spent on sidewalk and greenway projects in the same "pedestrian benefit zone" as the affected property within ten years. (Metro. Code

§ 17.20.120(D)(2), Doc. No. 1-2 at 5.) Accordingly, this option bears as much of a nexus to Plaintiffs' development activity as the requirement to build sidewalks.

As presented in the Metropolitan Government's motion for summary judgment, the ordinance applies to development activities that are likely to increase the need for sidewalks because of increased population density and traffic congestion. (Mem. L. Supporting Def.'s Mot. Summ. J., Doc. No. 22 at 21-22.) Plaintiffs wrongly claim that the sidewalk ordinance is meant to fix a "shortage" of sidewalks. (Pl.'s Mot. Summ. J., Doc. No. 19 at 13.) Rather, as the ordinance states, sidewalks are a means to several ends (BL2019-1659, Doc. No. 1-2 at 1-2); there is nothing desirable about a complete network of sidewalks in a vacuum.

Here, both Plaintiffs wanted to build large structures that were certain to increase the amount of living and car parking space on their properties. (Mem. L. Supporting Def.'s Mot. Summ. J., Doc. No. 22 at 4-5, 21-22.) Therefore, there is an essential nexus between the sidewalk ordinance's requirements and Plaintiffs' particular development activities. Plaintiffs insist that because they did not change the zoning or use of their properties, they did not create any need for sidewalks. (Mem. L. Supporting Pls.' Mot. Summ. J., Doc. No. 19 at 4, 11-12, 15.) Yet Plaintiffs offer no basis in law or fact for why only a zoning or use change would create a need for sidewalks. Indeed, Plaintiffs' specific development activities show why these are not the only factors relevant to the need for sidewalks. Knight wanted to build a structure more than triple the size of the 790-square-foot cottage that previously sat on his property, with a two-car garage to boot. (Def.'s Statement of Undisputed Material Facts ("SUMF"), Doc. No. 23 ¶¶ 3-5.) Mayes built a similar-sized house, also with a two-car garage, on vacant land. (*Id.* ¶¶ 10-11.) It is self-evident that building new homes on vacant land or replacing small homes with larger homes can lead to higher population density, which in turn

can increase pedestrian and car traffic, leading to more demand for sidewalks.[2] Likewise, adding parking spaces to vacant land increases the potential for traffic congestion nearby, among other negative effects.[3] Accordingly, there is a nexus between the sidewalk ordinance's requirements and Plaintiffs' specific development activities.

The same reasons show why rejecting Plaintiffs' permits would have advanced the policy goals of the sidewalk ordinance. To wit, Knight's lot remains empty, and the neighborhood is free of the sidewalk and traffic impacts that his larger house and new garage would have created. Contrast Mayes's case, wherein he paid an in-lieu fee that was allocated to a nearby sidewalk project, directly advancing the public policy goals of pedestrian safety and traffic reduction in his neighborhood. (Mem. L. Supporting Def.'s Mot. Summ. J., Doc. No. 22 at 5.)

Finally, Plaintiffs do not explain why Nashville's preexisting sidewalk deficiency is relevant to their claims. As presented above, the Supreme Court and lower courts have found that similar development activities bear a nexus to sidewalk-related exactions. Whether Nashville has lacked an adequate sidewalk network for 10 years or 100 is therefore immaterial. What matters is that Plaintiffs' particular building plans were strongly linked to the problems that the ordinance addresses.

### B. The Ordinance's Requirements Are Roughly Proportional To The Impact Of Plaintiffs' Development Activities.

If there is a nexus between an exaction and the effects of the proposed land use, the second step in the *Nollan/Dolan* test is to decide whether there is a "rough proportionality"

---

[2] *See generally* NashvilleNext Vol. V: Transportation, Access Nashville 2040 at 11, 34-35, 42, 72, 91-93, available at https://www.nashville.gov/departments/planning/nashvillenext/nashvillenext-plan.

[3] *Id.* at 45, 56-57.

{N0426919.1}  7

between the exaction and the nature and extent of the proposed development's impact. *Dolan*, 512 U.S. at 391. "No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.*

The sidewalk ordinance offers two paths to this determination, and Plaintiffs traveled both. First, Plaintiffs asked the Zoning Administrator to relax or eliminate the sidewalk ordinance's requirements as applied to their properties. (Def.'s SUMF ¶¶ 6, 12, Doc. No. 23.) Next, they both had hearings at the Board of Zoning Appeals ("BZA") where they submitted documents, photos, and testimony. (*Id.* ¶¶ 7, 13.) As presented in more detail below, Plaintiffs (or their representatives) answered questions from BZA members about their properties, including questions about why an in-lieu fee or an alternative sidewalk design was not feasible, and whether any hardship would justify an exemption.

In addition, the in-lieu fee option is more than proportional to Plaintiffs' development activities because the $186 per linear foot figure[4] that the Department of Public Works published for 2021 is much lower than the $837 per linear foot that the Metropolitan Government actually pays, on average, to build sidewalks.[5] This is because the Department of Public Works removes especially expensive projects from the average calculation and further reduces the cost-per-linear-foot figure to a level that does not impose an onerous burden on developers and property owners. (Declaration of Jeff Hammond, filed contemporaneously herewith.) Furthermore, the amount of any given in-lieu fee is capped at no more than three percent of the construction value of the building permit. (Metro. Code §

---

[4] The figure is published annually at https://www.nashville.gov/Planning-Department/Long-Range-Planning/Transportation-Planning/ Sidewalks.aspx.
[5] (Pls.' SUMF ¶ 13, Doc. No. 20.)

17.20.120(D)(1), Doc. No. 1-2 at 5.) Thus, Plaintiffs are incorrect that in-lieu fees are based on what the Metropolitan Government would pay for sidewalks as opposed to what a property owner would pay. (Mem. L. Supporting Pls.' Mot. Summ. J., Doc. No. 19 at 12.) In fact, in-lieu fees are greatly reduced so as not to impose an undue financial burden on landowners.

### i. Knight Received An Individualized Determination Before The Metropolitan Planning Department And The BZA.

Knight requested a variance from the sidewalk ordinance, which the Zoning Administrator denied on the Planning Department's recommendation. (411 Acklen Park Drive BZA Case File, Doc. No. 23-7 at 88.) The Planning Department referred to the applicable planning policies, the zoning of Knight's property as well as its proximity to public transit and bikeways, and found as follows:

> . . .
>
> (2) **Acklen Park Drive serves as a connecting route, parallel to West End Avenue, which provides east-to-west connectivity above Interstate 440 between Wrenwood, Sylvan Park, and West End Park**. **Additionally, phase I of the 440 Greenway has been completed to the east of the block further providing active transportation options between neighborhoods bisected by the interstate**. Establishing a connected pedestrian network via sidewalks and greenways is critical to planning goals inherent with supporting Urban Neighborhood Evolving policies.
>
> (3) The applicant stated in their initial sidewalk waiver request difficulties constructing sidewalks in association with drainage facilities along the property frontage. **Metro Water Services have indicated that no hardship exists that would prevent the construction of sidewalks along Acklen Park Drive.**
>
> (4) The property is located approximately 0.29 miles west of the Midtown Nashville Next first tier Center. **Construction of a connected and comfortable pedestrian network, which provides adequate space for the provision of utilities, mailboxes, and street trees is critical to support local planning goals for higher density residential and mixed-use neighborhoods.**
>
> (*Id.*) (emphasis added).

The Planning Department's analysis noted that Knight's property is near major thoroughfares and a newly-built greenway. It also observed the need for a pedestrian network in the neighborhood, as outlined in several Metropolitan Government policies. Further, the analysis considered unique features of Knight's property and found no hardship that would justify a waiver. Thus, before Knight appealed to the BZA, he effectively had an individualized determination of how the requirement to build sidewalks at 411 Acklen Park Drive or pay an in-lieu fee was proportional to his application for a building permit.

Knight, through counsel, argued his case for a variance at the May 21, 2020 BZA meeting. (Def.'s SUMF ¶ 7, Doc. No. 23.) Knight's attorney contended that Knight should not have to build a sidewalk because his proposed construction plan, combined with the required sidewalk, might create stormwater runoff problems. (May 21, 2020 BZA Meeting Recording, available at https://youtu.be/GOk6Qg2FNV8?t=2489, at 42:40-43:11, 45:38-51.) One BZA member observed that Knight was "obviously looking to enlarge the footprint of the house and that appears to have been what's triggered going over the impervious surface area that you mentioned; how would that not be a . . . self-imposed hardship?" (*Id.* at 55:55-56:22.) Knight's attorney answered, "Part of it is also the construction of the concrete driveway and the sidewalk." (*Id.* at 56:25-56:30.) The BZA member responded, "right, but as I'm looking at it, you're actually decreasing the amount of concrete and sidewalk – you know, flat surface – but you're increasing the building area so much that it ends up being a net increase, is that right?" (*Id.* at 56:36-52). Knight's attorney responded, "There is a net increase, correct." (*Id.* at 56:53-55.) Thus, Knight's attorney conceded that Knight was creating his own alleged hardship because he wanted to build a house that was three times the size of the cottage he was replacing. (*See also* Def.'s SUMF, Doc. No. 23 ¶¶ 3-5.)

At the BZA hearing, an email was read into the record stating that "Metro Water and Sewer can and does coordinate alternate sidewalk designs with Metro Planning Commission

and Metro Public Works as a standard practice. We can work with the applicant on an alternate design that meets Metro Government standards and specifications." (May 21, 2020 BZA Meeting Recording at 47:30-58.) Another email was read into the record stating the same principle, but from the perspective of the Public Works Department. (*Id.* at 47:58-48:17.) A BZA member then asked, "I guess the question to the applicant would be given those comments, is there a reason not to work out an alternative design with Public Works and Stormwater?" (*Id.* at 48:28-43.) Knight's attorney demurred. (*Id.* at 48:46-49:25.)

Metropolitan Councilmember Kathleen Murphy appeared at Knight's BZA hearing to oppose his variance request. She explained that the neighborhood needed to be more "pedestrian friendly" and that a sidewalk on Knight's street would be "vitally important" to connect to a nearby greenway and other sidewalks, specifically a new sidewalk nearby on 37th Avenue. (*Id.* at 49:45-52:33.) She was not alone in her opposition: two neighbors submitted an email stating, "Acklen Park Drive is a dangerous street for pedestrians. There are partial segments of sidewalks and then one must walk on the street which is busy and has a big curve. Sidewalks are needed." (411 Acklen Park Drive BZA Case File, Doc. No. 23-7 at 15.)

After hearing Councilmember Murphy's comments, BZA members asked whether Knight needed more time to work out an alternative sidewalk plan. (May 21, 2020 BZA Meeting Recording at 52:57-53:39.) Mr. Knight's attorney responded, "Respectfully, I would request that this be decided today." (*Id.* at 54:36-54:42.) After the public hearing closed, one BZA member stated, "I would like to have the applicant state for the record that it does not want to defer this matter for additional time and is expressing its strong desire for us to make a decision up or down at this point in time." (*Id.* at 1:03:45-1:04:07.) The BZA then reopened the public hearing, and Knight's attorney confirmed that he wanted a decision that day. (*Id.* at 1:05:24-43; 1:06:58-1:07:35 .)

The BZA considered the ordinance's requirements, the evidence in the record, and Knight's arguments; certain members voiced regret at Knight's apparent refusal to consider an alternative sidewalk design. (*Id.* at 1:00:00-1:04:10.) The BZA went so far as to reopen the public hearing to confirm that Knight wanted a decision that very day, and Knight's attorney did not budge. (*Id.* at 1:05:25-1:07:35.) The BZA then denied the request for a variance and offered Knight the choice to either build a sidewalk with an alternative design or pay the in-lieu fee. (Def.'s SUMF, Doc. No. 23 ¶ 8.)

Knight, through counsel, presented many of the same arguments to the BZA that he puts forward in this lawsuit, namely that he did not create the need for a sidewalk and should not have to pay for a public facility. The BZA considered those arguments and supporting evidence, asked questions of his attorney, deliberated in a public hearing, and decided not to vary the ordinance's requirements. Furthermore, even after learning that Knight could collaborate with Public Works on an alternative sidewalk design, his attorney declined and insisted on an immediate decision. Finally, Knight's attorney did not present any evidence to show why his application for a variance request was not based on a self-imposed hardship that he would have created by building such a massive house. Therefore, Knight cannot argue that there is no rough proportionality between the requirements of the sidewalk ordinance and his proposed development activity. For the same reasons, there is no basis in fact for Knight's claim that building a sidewalk would have caused public problems. (Mem. L. Supporting Pls.' Mot. Summ. J., Doc. No. 19 at 15.)

### ii. Mayes Received An Individualized Determination Before The Metropolitan Planning Department And The BZA.

Mayes also requested a variance from the sidewalk ordinance, which the Planning Department denied. (167 McCall Street BZA Case File, Doc. No. 23-9 at 19.) As with Knight's variance request, the Planning Department noted the zoning classification of the property,

its proximity to public transit and bikeways, the applicable planning policies, and found as follows:

> . . . Per the Zoning Ordinance, the applicant is eligible to contribute in-lieu of construction. **Electing to make the contribution in-lieu of construction supplements Metro's annual sidewalk capital program by increasing sidewalk construction funds for areas surrounding this property, within one of Metro's sixteen pedestrian benefit zones. Staff finds no unique hardship for the property**.
>
> Given the factors above, staff recommends disapproval as the applicant has the option to contribute in-lieu of construction. The applicant shall also dedicate right-of-way for future sidewalk construction.

*Id.* (emphasis added)

Mayes personally appeared before the BZA to ask for a variance from the sidewalk ordinance on March 5, 2020. (March 5, 2020 BZA Meeting Video Recording, available at https://www.youtube.com/watch?v=Knae7IG0eH4, beginning at 31:30.) At least one neighbor opposed Mayes's variance application with a handwritten note. (167 McCall Street BZA Case File, Doc. No. 23-9 at 8.) At the BZA meeting, Mayes stated that there was a sidewalk on the other side of his street, adding, "if we were to put a sidewalk in on our side of the street, there is a possibility of a safety issue with people using the sidewalk strictly in front of our house and then having to cross over a road that is very heavily traveled without any kind of pedestrian walkway or anything of that sort." (*Id.* at 32:21-40.)

Zoning Administrator Jon Michael responded, "They're absolutely right – there's no sidewalk there. They're absolutely right it's a long shot that there would ever be a sidewalk on that side of the street, which is why the sidewalk fund was deemed the appropriate response with regard to this new construction on McCall." (*Id.* at 36:20-34.) A BZA member, referring to the option to pay an in-lieu fee, asked Mayes, "Why was it not appropriate for you to pay something into the fund?" (*Id.* at 36:49-55.) Mayes's builder responded that

{N0426919.1}                                 13

Case 3:20-cv-00922   Document 26   Filed 09/27/21   Page 13 of 18 PageID #: 409

building a sidewalk would have costed "significantly less" than an in-lieu fee but for "stormwater infrastructure" issues that would have increased the cost. (*Id.* at 36:59-38:08.)

A board member then asked the builder, "What's the average lot frontage in the neighborhood? Is this a larger lot?" (*Id.* at 38:09-16.) The builder answered, "Most of the houses on McCall Street appear to sit on similar sized parcels of about 100 linear feet." (*Id.* at 38:16-26.) A BZA member later asked Mayes, "Is there a case for a hardship?" (*Id.* at 44:00-30.) Mayes responded, " . . . I don't anticipate anybody else within this stretch of road hitting this requirement . . . I don't anticipate this being an issue anywhere else along this stretch of road." (*Id.* at 44:45-45:00.) Mayes added, "$8800 is a lot of money out of my pocket. I pay taxes in this state; I pay taxes in this city; I'm born and raised here. It's a tough pill to swallow for us." (*Id.* at 46:00-15.)

After the public hearing closed, one BZA member commented that "the Metro Council made a policy decision that when you go build a house and you trigger this sidewalk requirement, you either have to pay or build, and they even made the policy decision about how much you have to pay and the only way around that is if there's a hardship, and your financial situation can never be a hardship . . . I don't see a hardship other than a financial hardship . . . I get it's a lot of money, but I just feel like when Metro enacted that law, they put down a policy and there has to be a hardship shown, and we know that a financial consideration that it costs money is just not a hardship." (*Id.* at 46:44-48:01.) The board then denied Mayes' application because he had the option to pay an in-lieu fee. (Def.'s SUMF ¶ 14, Doc. No. 23.)

Thus, Mayes received an individualized determination that showed a nexus and rough proportionality between the sidewalk ordinance's requirements and his building permit request. Mayes argued that building a small stretch of sidewalk on his side of the street where a sidewalk already existed on the other side was an unreasonable demand. But the

{N0426919.1}                                    14

Zoning Administrator responded that this was precisely the kind of situation where an in-lieu fee was appropriate. Specifically, building a sidewalk on Mayes's property would not meaningfully advance the purposes of the sidewalk ordinance, whereas paying an in-lieu fee would. In fact, just months later, Mayes's in-lieu fee funded a sidewalk repair project in the same pedestrian benefit zone. (Declaration of Jeff Hammond, Doc. No. 23-10 at 1.) Thus, the sidewalk ordinance directly advanced the goal of enhancing Nashville's sidewalk network in his own neighborhood. For this reason, Mayes cannot argue that there is no nexus or rough proportionality between the sidewalk ordinance and his particular development activity.

In addition, the BZA noted that the sidewalk ordinance reflected the Metropolitan Council's policy decisions as to the amount of in-lieu fees and what would justify a variance from the ordinance's application, further supporting the conclusion that the ordinance is a legislative land use condition not subject to *Nollan/Dolan* scrutiny. (*See* Mem. L. Supporting Def's Mot. Summ. J., Doc. No. 22 at 19-20.)

### C. The Sidewalk Ordinance Offers A Constitutional Alternative To Building Sidewalks.

The Supreme Court has held that "so long as a permitting authority offers the landowner at least one alternative that would satisfy *Nollan* and *Dolan*, the landowner has not been subjected to an unconstitutional condition." *Koontz*, 570 U.S. at 611. If this Court finds fault with the requirement to build sidewalks, the option to pay an in-lieu fee is constitutional; therefore, the ordinance should stand. *Calif. Bldg. Indus. Ass'n.*, 351 P.3d at 1002 ("Because an in-lieu fee option is often included . . . to satisfy the demands of developers who seek the flexibility that an in-lieu fee alternative affords, [Plaintiffs] cannot properly rely upon the inclusion of such an option as a basis for challenging the validity of the . . . ordinance as a whole.").

Furthermore, the ordinance offers a variance and appeal process to prevent unfair burdens on property owners with unique hardships. Both Plaintiffs took advantage of this process and received individualized determinations that the ordinance bore an essential nexus and rough proportionality to their proposed development activities. Both were given the option to pay an in-lieu fee to avoid building isolated segments of sidewalks.[6] Mayes did so, and a sidewalk in his neighborhood was repaired in short order.

### III. MAYES IS NOT ENTITLED TO RESTITUTION OF HIS IN-LIEU PAYMENT.

Mayes may not recover his $8,883.21 in-lieu payment under a theory of unjust enrichment because, for the reasons stated above, the fee was lawfully collected and allocated to improve sidewalks in Mayes's neighborhood. As such, Mayes and his neighbors, not the Metropolitan Government, benefited from the payment. (*See* Mem. L. Supporting Def.'s Mot. Summ. J., Doc. No. 22 at 28-30.) The authority Plaintiffs rely on supports this conclusion. *See Halpern 2012, LLC v. City of Ctr. Line, Michigan*, 806 F. App'x 390, 398 (6th Cir. 2020) (rejecting an unjust enrichment claim to recover fees paid to a city, finding "no indication that the fees were excessive, used for anything other than their stated purpose, or obtained unfairly.") *Noel v. Metro. Gov't of Nashville*, No. 3:11-CV-519, 2014 WL 2964949 (M.D. Tenn. July 1, 2014), and *Sircy v. Metro. Gov't of Nashville & Davidson Cty.*, 182 S.W.3d 815, 816-18 (Tenn. Ct. App. 2005), are inapposite because those cases concerned employee pay rates, not fees paid under a regulatory scheme. Likewise, *City of Lebanon v. Baird*, 756 S.W.2d 236, 238-39 (Tenn. 1988), dealt with a city's default on a land sale contract and does not support Plaintiffs' position.

---

[6] Plaintiffs decry "sidewalks to nowhere" many times, but they do not explain how such things cause a constitutional injury under the Fifth Amendment. (Pls.' Mot. Summ. J., Doc. No. 19 at 1-3, 5, 14-15, 18.)

It is well-settled that the measure of damages in a takings claim is just compensation, not equitable relief. *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2176 (2019). Mayes has presented no federal or state authority to establish a right to restitution on these facts. *See Koontz*, 570 U.S. at 608-10. In any event, just compensation under the Fifth Amendment is for real property, not money. U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); *see also Koontz*, 570 U.S. at 622-24 (Kagan, J., dissenting). Thus, Mayes is not entitled to restitution of his in-lieu payment.

## CONCLUSION

The court should deny Plaintiffs' motion for summary judgment because Nashville's sidewalk ordinance did not unlawfully exact their property as a matter of law. The sidewalk ordinance is constitutional under rational basis review because it is a generally applicable land use regulation with strong links to compelling public interests. Even if the Court finds that the ordinance is an exaction, it is constitutional under any standard of review because its goals are reasonably related to the impact of Plaintiffs' development activities, and its burdens are minimal. But even under the *Nollan/Dolan* standard that Plaintiffs demand, their claims fail because the sidewalk ordinance's requirements bore a nexus and rough proportionality to their development activities. Finally, Mayes is not entitled to the restitution of fees. Accordingly, Plaintiffs' claims fail, and the Court should instead grant the Metropolitan Government's motion for summary judgment.

Respectfully submitted,

THE DEPARTMENT OF LAW OF THE
METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON COUNTY
WALLACE W. DIETZ (#9949)
DIRECTOR OF LAW

*/s/ John W. Ayers*
ALLISON L. BUSSELL (#23538)
JOHN W. AYERS (#37494)
108 Metropolitan Courthouse
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6341
allison.bussell@nashville.gov
will.ayers@nashville.gov

*Counsel for the Metropolitan Government*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been forwarded by electronic mail and the electronic filing system to:

| | |
|---|---|
| Meggan S. Dewitt | Braden H. Boucek |
| Beacon Center | Kimberly S. Hermann |
| 201 4th Ave. N., Suite 1820 | Cece O'Leary |
| Nashville, TN 37219 | Southeastern Legal Foundation |
| | 560 West Crossville Road, Suite 104 |
| | Roswell, GA 30075 |

on this the 27th day of September, 2021.

*/s/ John W. Ayers*
John W. Ayers