IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMES KNIGHT, JASON MAYES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-00922 |
| | ) | Judge Trauger |
| THE METROPOLITAN GOVERNMENT | ) | Magistrate Judge Holmes |
| OF NASHVILLE AND DAVIDSON | ) | |
| COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFFS' REPLY TO THE METROPOLITAN GOVERNMENT'S RESPONSE TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs respectfully reply to the Metropolitan Government of Nashville & Davidson County's (Metro's) Response to Plaintiffs' Motion for Summary Judgment.

## INTRODUCTION

Any time the government conditions the receipt of a benefit—here, a building permit—on a property owner's agreement to give up a constitutional right—the right to build on his private property—the government must demonstrate that the condition survives the essential nexus and rough proportionality test. *See Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013). Metro cannot show that the sidewalk ordinance serves an essential nexus to the potential impact of Plaintiffs' proposed land use because building a home does nothing to exacerbate a sixty-year-old infrastructure problem. Likewise, because Metro never conducted an individualized assessment of the potential impact of each Plaintiffs' proposed land use, it also

cannot demonstrate that the condition survives the proportionality standard. For these reasons, the ordinance is unconstitutional.

## **ARGUMENT**

It is no secret that Metro desires more sidewalks but cannot fund them. *See NashvilleNext Vol. V: Access Nashville 2040*, at 42 (2015) (*NashvilleNext*).[1] Metro admits that "[r]etrofitting all streets in Nashville with sidewalks is costly because sidewalk construction usually means much more than laying down a strip of concrete. It requires implementing curb and gutter to handle stormwater and potentially acquiring right[s]-of-way from property owners." *Id*. But if Metro can require private property owners to bear the high cost of constructing sidewalks, address stormwater runoff issues, and grant rights-of-way on their land to the public, suddenly the city's job becomes significantly easier—and cheaper. As such, Metro has imposed a blanket ordinance that forces property owners to individually bear the costs of a sixty-year problem. *See* Metro Code § 17.20.120 *et seq*. The sidewalk ordinance authorizes Metro to withhold permits unless and until applicants agree to install sidewalks or pay an in-lieu fee.[2] *See Nollan*, 483 U.S. 825 (conditioning permit approval on agreement to grant public easement on private property); *Dolan*, 512 U.S. 374 (conditioning permit approval on agreement to improve storm drainage and grant public easement on private property); *Koontz*, 570 U.S. 595 (conditioning permit approval on agreement to deed private property to the public or pay an in-lieu fee).

---

[1] https://filetransfer.nashville.gov/portals/0/sitecontent/Planning/docs/NashvilleNext/PlanVolumes/next-volume5-AccessNashville2040.pdf. ("Securing adequate funding for sidewalk construction . . . historically has been challenging for Nashville[.]")

[2] Metro contradicts itself in its Response brief when it argues that the sidewalk ordinance is a generally applicable land use regulation subject to the *Penn Central* test (Doc. 26, Def.'s Resp. at 1), but, also, that the ordinance was applied to Plaintiffs on an individual basis. (Id. at 10-15.) The law cannot be both generally and individually applicable.

2

Together, the essential nexus and rough proportionality tests under the *Nollan/Dolan* framework hold that the government cannot condition approval of land-use permits on a requirement that private property owners dedicate private property to the public, unless the government can show that the dedication is necessary to mitigate impacts caused by the intended land use. *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594-95 (2013). When evaluating such claims under the Fifth Amendment, a court "must first determine whether the 'essential nexus' exists between the 'legitimate state interest' and the permit condition exacted by the city." *Dolan*, 512 U.S. at 386 (quoting *Nollan*, 483 U.S. at 837). If a nexus exists, the court must then assess the condition's rough proportionality, or "the required degree of connection between the exactions and the projected impact of the proposed development." *Id*.

I.  **Metro fails to establish an essential nexus between the sidewalk condition and any public impact Plaintiffs' proposed land use may have.**

Whenever a government entity withholds a land use permit in exchange for a demand, the demand must be closely related to any public problems the proposed land use will exacerbate. If the proposed land use does not directly cause a negative public impact, the government cannot impose the condition. *See Nollan*, 438 U.S. at 838; *Dolan*, 512 U.S. at 930-31. Thus, Metro must demonstrate that building single-family homes causes the need for more sidewalks. And if denying a permit would not remedy the public problem of a need for more sidewalks, the government cannot impose the condition. *Nollan*, 483 U.S. at 837. Metro must show that by refusing to let a property owner build on his own land, it is fixing Nashville's sidewalk and related social problems.

First, Metro claims an essential nexus exists "between the sidewalk ordinance's requirement to build sidewalks and public safety as well as traffic mitigation and related benefits[.]" (Doc. 26, Def.'s Resp. at 5.) But Metro skips a required step in the nexus inquiry. Under *Nollan/Dolan*, an essential nexus exists only where the proposed, individual *land use*

3

(developing a home) directly causes or contributes to the public problem (safety and traffic flow) and applying the permit condition (the sidewalk ordinance) to the developer will remedy that problem. *See Levin v. City & Cty. of San Francisco*, 71 F. Supp. 3d 1072, 1088-89 (N.D. Cal. 2014). Metro fails to show the causal connection between Plaintiffs' homebuilding plans and public safety and traffic concerns, such that the sidewalk condition is justified. While building sidewalks according to the ordinance may alleviate some of the difficulties Metro has expressed, there is still no direct cause and effect link between a homebuilder's use of property and the need for the exaction. Metro cannot charge Plaintiffs and similarly situated property owners with the task of fixing social problems predominantly caused by forces outside their control. *See Levin*, 71 F. Supp. 3d at 1086 (citing *Koontz*, 133 S. Ct. at 2600).

Metro suggests that by building "large structures that were certain to increase the amount of living and car parking space on their properties," Plaintiffs' proposed land uses were "likely" to impact population density and traffic congestion. (Doc. 26, Def.'s Resp. at 6.) But Metro's interrogatory responses preclude it offering this justification. When asked what problems caused by Plaintiffs gave rise to the need for the construction of sidewalks, Metro said it was solely the eligibility criteria in the ordinance itself, which have nothing to do with the size of the structure or parking spaces. (Doc. 20, Pls.' SUMF ¶ 2 ("No other characteristics of Plaintiffs' properties were considered in order for the ordinance to apply to them.").) The criteria "are fully and completely stated" in Sections A and B of the sidewalk ordinance. (Id.) Section A provides that the sidewalk ordinance is applicable to any single-family or two-family homes within the Urban Zoning Overlay, or when the property is on a street in the major and collector street plan. Metro Code § 17.20.120(A). Section B describes sidewalk installation for multi-family and nonresidential

4

development. Metro Code § 17.20.120(B). The ordinance does not apply differently based on a property's size or its potential impact on public traffic, safety, or population density.

Moreover, the only support Metro offers is the attenuated claim that rebuilding a larger home where a smaller one previously existed or building a home on a lot already zoned for medium density residential use *could* lead to population growth. (Id. at 6-7.) Likewise, Metro indicates that building a garage will somehow contribute to the torments of rush hour. (Id.) But simply building or improving on a structure does nothing to increase population density or traffic congestion, particularly when the lots are already zoned for medium density residential use.[3] By Metro's logic, the sidewalk ordinance would survive the nexus test under the slightest of variables. For example, the government could impose the sidewalk condition on a family of four who buys a home from a family of three because they would increase the population density. This grossly oversimplifies the nexus standard.

If the sidewalk condition remediated social problems resulting from increasing home and garage sizes, then Metro would require it for any expansion. Yet Metro does *not* require sidewalk installation when a property owner renovates or expands an existing single-family home. (Doc. 20-4, Declaration of Braden H. Boucek (Boucek Decl.), Ex. 1 at PageID #: 139.) This drastically undermines Metro's argument that building a larger home on a lot will increase population density and thus require more sidewalks, because expanding a home would have the exact same effect.

---

[3] The properties are—and always have been—zoned for medium density residential use. (Doc. 20, Pls.' SUMF ¶¶ 15, 23.) Nothing about Plaintiffs' requested permits would change that. Moreover, building a garage does not mean that a property suddenly maintains more cars or, even more absurd, that more cars will be present on the road as a result. That is why a sidewalk condition that applies even when the applicant is entitled to build the home by right under zoning could never amount to an essential nexus under *Nollan*/*Dolan*.

5

Thus, it cannot be that increasing the square footage of a home directly causes or contributes to the need for more sidewalks in Nashville.

Finally, Metro dismisses the importance of Nashville's preexisting sidewalk shortage that dates back to the 1950s. (Doc. 26, Def.'s Resp. at 7.) Yet the longstanding problem illustrates how Metro's solution goes straight to the heart of the Fifth Amendment. *See Dolan*, 512 U.S. at 384 ("One of the principal purposes of the Takings Clause is 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'") (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). Throughout Metro's website and publications, it frequently and repeatedly describes how rapid expansion beginning in the 1950s meant that "Nashville could not always afford to expand necessary infrastructure . . . [creating] long-term barriers to walkability." *Nashvillenext* at 42; *accord Plan for Sidewalks and Bikeways*, WalknBike Nashville, at 57 (2017).[4] Metro also openly admits that it cannot afford to remedy those problems. In fact, Metro has even recognized that "[l]ocal leaders should respond" to the perceived sidewalk shortage "by making sidewalk funding a higher priority in Nashville's annual budget." *Nashvillenext* at 42. When Metro recommended allowing Jason to pay the in-lieu fee, the Planning Commission stated that it would "supplement[] Metro's annual sidewalk capital program by increasing sidewalk construction funds[.]"[5] (Doc. 20-4, Boucek Decl. ¶ 9, Ex. 6, PageID #: 173.) Metro has recognized that the need for sidewalks is a public issue which requires a public remedy.

---

[4] https://filetransfer.nashville.gov/portals/0/sitecontent/pw/docs/transportation/WalknBike/WalknBikeFinalPlan.pdf.

[5] Plaintiffs erroneously attributed this statement to the BZA in their SUMF. (Doc. 20, Pls.' SUMF ¶ 27.) The BZA ultimately ratified Planning's recommendation. (Doc. 1, Compl. ¶¶ 107-08; Doc. 10, Ans. ¶¶ 107-08.)

6

## II. Metro fails to show that the sidewalk condition is roughly proportional to any public impact Plaintiffs' proposed land use may have.

Putting aside that the sidewalk law cannot survive the essential nexus standard, Metro also cannot demonstrate that the exaction is roughly proportional to the impact Plaintiffs' proposed land use will have on the public. To survive the proportionality test, the city must show it has made an individualized assessment of each property before applying the conditions in the sidewalk ordinance. But by its own terms, the sidewalk ordinance does not permit such individualized assessments. It fails, both facially and as-applied.

First, when evaluating an application to build a single-family home, Metro admits that it *only* relies on the criteria listed in Sections A and B of the sidewalk ordinance. (Doc. 20, Pls.' SUMF ¶ 2 ("The criteria used to determine if the sidewalk law applies to a given permit applicant are fully and completely stated in the applicability provisions of the sidewalk law itself, namely Sections A and B of Metropolitan Code of Laws § 17.20.120 . . . *No other characteristics of Plaintiffs' properties were considered in order for the ordinance to apply to them*.")(emphasis added).) Sections A and B *only* require Metro to look at the location of the property. If the property falls within certain parts of town, the sidewalk condition applies. If the property is in other parts of town, the condition does not apply. In this way, Metro intentionally avoids any individualized consideration of the potential public impact of a proposed land use on any particular property. And obviously where a particular parcel is located has no bearing on any of the supposed social ills Metro cites as requiring the sidewalk condition.

Metro argues that because Plaintiffs appealed the sidewalk condition to the Board of Zoning Appeals (BZA), their properties underwent an individualized assessment that concluded the sidewalk condition is related in extent and nature to the impact of their proposed land use. (Doc. 26, Def.'s Resp. at 8-15.) But in support, the city simply restates the sidewalk law, describing

7

that the BZA determined Plaintiffs' properties were located in the Urban Zoning Overlay. (Id. at 9-10, 12-13.) Once the BZA determined that Plaintiffs triggered the sidewalk condition by virtue of where their properties were located, it demanded Plaintiffs either build a sidewalk or pay an in-lieu fee.[6] *See Dolan*, 512 U.S. at 389 ("very generalized statements" is a standard "too lax to adequately protect petitioner's right to secure just compensation if her property is taken for a public purpose"). As is quite clear from a review of Jason's hearing, *see* Doc. 1, Compl. ¶¶ 103-05; Doc. 10, Ans. ¶¶ 103-5, the BZA certainly did not evaluate the supposed harms caused by Plaintiffs when they built under existing zoning when imposing the condition.

The only time there was any indication that the BZA considered Plaintiffs' properties on an individual basis was when the Board determined that neither Plaintiff suffered a hardship when requesting a variance under the ordinance. That is the wrong inquiry. An individualized consideration of whether Plaintiffs had a *hardship* is entirely different from an individualized assessment of whether the "required dedication is related both in nature and extent *to the impact of the development.*" *Dolan,* 512 U.S. at 391 (emphasis added). The record is perfectly clear that when Metro set the cost of the in-lieu fee, it never considered the nature or impact of Plaintiffs' projects. It just considered Plaintiffs' ability to pay, and otherwise followed the formula set forth by the ordinance that turns on the cost Metro pays to build and the length of the property frontage. *See* Metro Code § 17.20.120(D)(1); (Doc. 20, Pls.' SUMF ¶ 5.) While no "precise mathematical calculation" is required, "the city must make some effort to quantify its findings in support of the dedication." *Dolan* at 395-96. Here the city made none. It followed a rote formula.

---

[6] To bolster its argument, Metro explains that a few neighbors wrote letters demanding that the Plaintiffs install sidewalks. (Doc. 26, Def.'s Resp. at 11, 13.) If anything, this simply shows that Nashville has a sidewalk problem, the public wants sidewalks built, and members of the public want someone else to pay for them.

The BZA determined any hardship to Jim would be self-imposed by his construction plans and thus no hardship actually existed. (Doc. 26, Def.'s Resp. at 12.) Even if hardship had some legal bearing, the fact remains that there would be no hardship whatsoever *but for* the city's demand that Jim build sidewalks. And for Jason, the BZA simply determined there was no unique hardship without expanding on its reasoning. (Id. at 13.) The Board even admitted that the in-lieu fee costs "a lot of money, but . . . when Metro enacted that law, they put down a policy and there has to be a hardship shown, and we know that a financial consideration that it costs money is just not a hardship." (Id. at 14.)[7]

Moreover, Metro overlooks Plaintiffs' facial challenge to the sidewalk ordinance. On its face, the ordinance is not proportional to the impact of *any* proposed land use developments because it "force[s] the property owner to pay for a broad public problem not of the owner's making[.]" *Levin*, 71 F. Supp. 3d at 1086. This is especially true when the public problem pre-exists the permit condition. *Id.* at 1085. Metro admits that the BZA lacks authority to make the constitutionally required individualized determinations. Instead, when a property owner requests a variance from the sidewalk ordinance, the BZA is only authorized to require an in-lieu fee, an alternative sidewalk design, "or other appropriate mitigation for the loss of the public improvement *as a condition to a variance*." (Doc. 20-4, Boucek Decl. ¶ 5, Ex. 2 ¶ 13 PageID #: 150-51 (emphasis added).) Ultimately, through the ordinance, the city leverages private property owners' agreement

---

[7] Metro also claims that the in-lieu fee is a constitutional alternative to the sidewalk ordinance, but it never explains how the fee survives *Nollan*, *Dolan*, and *Koontz*. (*See* Doc. 26, Def.'s Resp. at 15-16.) Jason's in-lieu fee funded a sidewalk miles away from his home, hardly proportional to any alleged impacts of his home building project. (*See* Doc. 19, Pls.' Mem. at 18.) Moreover, although the in-lieu fee is less than $837 per linear foot (Doc. 26, Def.'s Resp. at 8), the fee is the same for all property owners; Metro obviously does not take the impact of individual properties into account when calculating it. (Id.; *see also* Declaration of Jeff Hammond (describing how Metro relies on prior years' costs to set the same in-lieu fee for all property owners each year).)

9

to improve city sidewalks—whether through construction, fees, or alternative designs—as a condition for granting a building permit. The BZA does not have any authority to refrain from imposing the condition and thus cannot make any individualized determination about whether a proposed land use will have a significant impact on the public that justifies imposing the condition.

## CONCLUSION

This Court should deny Metro's Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

Dated: <u>October 11, 2021</u>.                                    Respectfully submitted,


<u>  s/ B. H. Boucek      </u>
BRADEN H. BOUCEK
TN BPR No. 021399
GA Bar No. 396831

<u>  s/ Kimberly Hermann  </u>
KIMBERLY HERMANN*
GA Bar No. 646473
Southeastern Legal Foundation
560 West Crossville Road, Suite 104
Roswell, GA 30075
Telephone: 770/977.2131
bboucek@southeasternlegal.org
khermann@southeasternlegal.org

<u>s/ Meggan DeWitt</u>
MEGGAN DEWITT
DC Bar No. 1047631
Beacon Center of Tennessee
P.O. Box 198646
Nashville, TN 37219
Tel: 615/383.6431
meggan@beacontn.org

*Appearing Pro Hac Vice*

Counsel for plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following persons by the following mean(s) on the following date:

| Counsel | Counsel for | Via |
|---|---|---|
| Allison Bussell<br>Will Ayers<br>Metropolitan Courthouse<br>Ste. 108<br>P.O. Box 196300<br>Nashville, TN 37219-6300<br>615/862.6341<br>Allison.Bussell@nashville.gov<br>Will.ayers@nashville.gov | Defendant | ☐United States mail, postage prepaid<br>☐Hand delivery<br>☐Fax<br>☐Email<br>☐FedEx<br>☒Efile |
| Meggan DeWitt<br>1200 E Clinton St. #205<br>Nashville, TN 37203<br>(o) (615) 383-6431<br>meggan@beacontn.org | Plaintiffs | ☐United States mail, postage prepaid<br>☐Hand delivery<br>☐Fax<br>☐Email<br>☐Fed Ex<br>☒Efile |

On this date: <u>October 11, 2021</u>.

<u>s/ B. H. Boucek</u>
BRADEN H. BOUCEK

11