**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JAMES KNIGHT and JASON MAYES,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00922** |
| | ) | **Judge Aleta A. Trauger** |
| **THE METROPOLITAN** | ) | |
| **GOVERNMENT OF NASHVILLE AND** | ) | |
| **DAVIDSON COUNTY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Plaintiffs James Knight and Jason Mayes are individuals who own residential property in Nashville, Tennessee. They have brought suit challenging the constitutionality of the so-called Sidewalk Ordinance implemented by the Metropolitan Government of Nashville and Davidson County ("Metro"), which the plaintiffs describe as "conditioning home building permits on the property owner's funding of sidewalks." (Doc. No. 1, at 1.) Now before the court are two Motions for Summary Judgment, one filed by the plaintiffs (Doc. No. 18), and one filed by Metro (Doc. No. 21). For the reasons set forth herein, the court will grant Metro's motion and deny the plaintiffs'.

**I. FACTS AND PROCEDURAL BACKGROUND**

The facts, for purposes of both parties' motions, are basically undisputed.

In 2019, Metro passed Ordinance No. BL2019-1659, amending Metropolitan Code § 17.20.120, the "Sidewalk Ordinance." The Sidewalk Ordinance applies to the construction of all new single-family and two-family homes and to the substantial renovation or expansion of existing

single- and two-family homes[1] within the "urban services district, or within a center designated in the general plan, or [if] any of the property frontage is within a quarter mile of the boundary of a center designated in the general plan, or the property is on a street in the major and collector street plan." Metro. Code § 17.20.120(A)(1).[2]

Any property owner who wants to construct a new residence on property within the area covered by the Sidewalk Ordinance must agree to construct a city sidewalk on the owner's property frontage in order to receive a building permit, *id.* § 17.20.120(C), unless the owner obtains from the "Zoning Administrator" a waiver of the requirement, based on one of the circumstances identified in § 17.20.120(A)(3), or unless the owner is authorized, based on "unique situations," to make an "in-lieu contribution" (the "in-lieu fee") to Metro's pedestrian benefit fund as "an alternative to construction" of a sidewalk, *id.* § 17.20-120(A)(3)(b), (D)(1).

The in-lieu fee is established by Metro Public Works every year on July 1, based on (but reduced from) the average cost of all new and repair sidewalk projects contracted for or constructed by Metro over the preceding three years. (Doc. No. 28, Hammond Decl. ¶¶ 5–8.) The "in-lieu fee" cost-per-linear-foot figure for the year 2020–21 was $186. (*Id.* ¶ 4.) This cost is published at https://www.nashville.gov/departments/planning/long-range-planning/transportation-planning/sidewalks. The total in-lieu fee is capped at no more than three percent of the "total construction value of the permit." Metro. Code § 17.20-120(D)(1). As of January 2020, the actual cost to Metro

---

[1] The Sidewalk Ordinance also applies to certain multifamily and commercial development activities, Metro. Code § 17.20.120(A)(1), but such application is not relevant here.

[2] Section 17.20.120(A)(2) refers to construction "within the Urban Zoning Overly" [sic]. The term is not defined, and it is unclear how the Urban Zoning Overlay differs from the urban services district, as used in § 17.20.120(A)(1). This lack of clarity does not appear to be material, as there is no dispute that the plaintiffs' properties are within the zone to which the Sidewalk Ordinance applies.

to build sidewalks averaged $837 per linear foot, of which 18% is attributable to service costs and 82% to construction costs.

The Sidewalk Ordinance also states that the "[d]edication of right-of-way and/or public easement is required to permit present or future installation of a public sidewalk built to the current standards of the Metropolitan Government," Metro. Code § 17.20.120(E), apparently irrespective of whether the property owner builds the sidewalk or pays the in-lieu fee.[3]

The purposes of the Sidewalk Ordinance, as stated in the recital clauses of BL2019-1659, include:

> (1) To "provid[e] a wider variety of safe transportation options in a rapidly growing Nashville" through sidewalks, which are "critical infrastructure";

> (2) To "benefit homeowners and neighborhoods by providing a safe and designated path for connecting to schools, parks, libraries, businesses, and transit, and thus homes connected to nearby attractions increase in value";

> (3) To reduce the number of people killed on Nashville's streets while walking;

> (4) To provide for the "timely and cost-effective provision of sidewalks within the public right-of-way in the areas of greatest need and where the impact of Nashville's growth is greatest, aligned with the General Plan and related strategic plans in Nashville and Davidson County";

> (5) To "create a publicly transparent, documented, noticed, and appealable process for the consideration of hardship waivers, in whole or in part, to the various provisions of Title 17.20.120";

---

[3] The language of the provision itself indicates that an easement or right of way is required even if the sidewalk is not actually built, insofar as it is intended to permit the "future installation" of a sidewalk. *See* Metro Code § 17.20.120(E). Metro attempts to create a factual dispute as to that point, stating that the right-of-way or easement is only required if the sidewalk is actually built. However, the citation it offers in support of that assertion establishes only that a right-of-way or easement is required if the sidewalk is built, not that one is *not* required if the sidewalk is *not* built. (*See* Doc. No. 20-4, at 5 ("Metro Nashville Sidewalk Frequently Asked Questions") ("What other requirements apply when I construct sidewalks? . . . . Dedication of rights-of-way and easements are required with the construction of sidewalks.").) However, it does not appear that Metro demanded the dedication of an easement or right of way from either plaintiff in this case.

(6) To "facilitate safe and convenient pedestrian movements for residents, employees and/or patrons";

(7) To "reduce dependency on the automobile, thus reducing traffic congestion on the community's streets and protecting air quality";

(8) To "designat[e] . . . accessible and safe path[s] for walking," in order to "increase homeowner and community health and social connections";

(9) To "minimize conflicts between vehicular and pedestrian movement along corridors and within and around centers identified in the General Plan" and "offset a portion of the vehicular traffic consequences of population growth and increased density";

(10) To "create[e] a safe and convenient sidewalk network along the streets, corridors and centers . . . where the impact of Nashville's growth is greatest"; and

(11) To "create greener, safer, and more accessible streets for all users."

(BL2019-1659, Doc. No. 1-2 , at 1–2.)

Another purpose of the Sidewalk Ordinance is to further Metro's interest in effectively managing stormwater flow by ensuring that sidewalks are built according to uniform engineering standards approved by the Department of Public Works. (Doc. No. 20-4, Metro's Supp. Answers to Pl.'s 1st Set of Interrogs. ¶ 7.)

In an undated slide presentation regarding the Sidewalk Ordinance, supposedly shown to unidentified "stakeholders"[4] by unidentified Metro representatives, increased time and expense are identified as "challenges" to funding sidewalks through a Metro capital project, while one advantage of "private development" is that property owners are responsible for sidewalks on their "own property." (*See* Doc. No. 20-4, at 25.)[5]

---

[4] A January 31, 2020 letter from District 7 Councilwoman Emily Benedict, in her capacity as Chair, Special Committee on Sidewalks, to Vice Mayor Jim Shulman identifies some of the "stakeholders" with whom the Special Committee on Sidewalks spoke as including "Public Works, Planning, Procurement, Metro Water and Stormwater Services, and the Mayor's Office of Transportation." (Doc. No. 20-4, at 29.)

[5] Metro disputes the admissibility of this document, but the plaintiff represents that it was produced by Metro in discovery, with a group of documents collectively identified by Metro as

**Plaintiff James Knight**

Plaintiff James Knight owns a lot at 411 Acklen Park Drive in Nashville. The property is zoned for medium-density residential development, meaning that the construction of a single-family home on the lot is allowable under existing zoning. The lot at 411 Acklen Park Drive does not border or connect to any lots with sidewalks. As a condition of issuing a permit to construct a single-family home on the lot, Metro required Knight either to construct a sidewalk on the property or pay an in-lieu fee of $7,600.

In 2018, Knight demolished the existing 790-square-foot home on the lot. In 2019, Knight applied for a building permit to build a 2,651-square-foot residence, with a 323 square-foot garage and porches covering an additional 468 square feet on the lot. After Knight applied for a building permit, Public Works advised his project manager, Erick Stevenhagen, that constructing a sidewalk on the property would create water runoff issues that could cause water pooling and flooding on neighboring properties. The problem was not entirely attributable to building a sidewalk; it was also partly attributable to Knight's desire to build a bigger house than the existing house on the lot, which would have increased the percentage of the lot covered with impervious surfaces.[6]

In October 2019, Knight filed a Codes Waiver Zoning Request, asking the Zoning Administrator to waive Knight's compliance with the Sidewalk Ordinance. The Zoning Administrator denied the request upon the recommendation of the Planning Department on

---

"documents regarding the stakeholder meetings related to BL2019-1659." (Doc. No. 32-1, Boucek Supp. Decl. ¶ 5.) The plaintiff maintains that the document qualifies as a statement by an opposing party and that it is admissible under Rules 801(d)(2), 803(8), and 807(a) of the Federal Rules of Evidence. The court finds that the document may be considered in the context of considering the plaintiff's Motion for Summary Judgment but questions the ultimate materiality of this slide presentation.

[6] There is no suggestion that the size of the house Knight seeks to build is larger or covers more surface area than is permissible under current zoning.

January 15, 2020. Knight appealed to Metro's Board of Zoning Appeals ("BZA"), requesting that he be allowed to proceed without building a sidewalk or paying the in-lieu fee. The BZA conducted a hearing on his case on May 21, 2020. It denied Knight's petition but offered him the choice of building an "alternate sidewalk that is reviewed with Public Works"—presumably using permeable building materials—or paying the in-lieu fee.

When Metro refused to remove the condition that Knight either build a sidewalk on the lot frontage or pay the in-lieu fee, Knight refused to comply or to grant an easement for a sidewalk at 411 Acklen Park Drive, and his building permit expired. He states that, "[b]ut for the sidewalk condition, [he] would have proceeded with the project, agreeing to Metro's other requirements for building a home on the property." (*Id.* ¶ 20.) To date, he has not built a home at 411 Acklen Park Drive. He states that, if the sidewalk condition is removed, he will "obtain another construction permit and proceed with building a single-family home at 411 Acklen Park Drive." (*Id.* ¶ 21.)

### Plaintiff Jason Mayes

Plaintiff Jason Mayes owns a lot at 167 McCall Street in Nashville, within the urban services district. The lot is zoned for low-medium density residential, meaning that the construction of a single-family home on the lot is allowable under existing zoning. The lot at 167 McCall Street does not directly border or connect to any lots with sidewalks. There is a sidewalk on the opposite side of the street from 167 McCall Street.

At the time Mayes acquired the lot, it was vacant. In November 2019, Mayes applied for a permit to build a new single-family home with 2,375 square feet of living space and a 640-square-foot garage. As a condition of issuing a permit to construct a single-family home on the lot, Metro required that Mayes either construct a sidewalk on the property or pay an in-lieu fee of $8,883.21. Mayes' request for a waiver of the sidewalk requirement was denied. Mayes paid the in-lieu fee,

was issued a building permit, and completed building a single-family home on the lot in November 2020. (Doc. No. 20-2, Mayes Decl. ¶ 22.)

In the meantime, he petitioned the BZA to return the in-lieu fee on the basis that Metro had no intention or plan to build sidewalks on his side of the street; his councilwoman supported his request. (*Id.* ¶ 23.) The Planning Department Staff recommended denial of the request on the basis that "[e]lecting to make the contribution in-lieu of construction supplements Metro's annual sidewalk capital program by increasing sidewalk funds." (Doc. No. 20-4, at 39.) It also recommended that the "applicant . . . dedicate [a] right-of-way for future sidewalk construction." (*Id.*) The BZA heard his appeal on March 5, 2020 and ultimately denied his request for return of the in-lieu fee. Mayes has not dedicated an easement for a sidewalk at 167 McCall Street.

Mayes has been informed that Metro designated funds from his payment of the in-lieu fee to improvement of sidewalks on Foster Avenue. Although the location is more than 2.5 miles north-northwest of his home, both Foster Avenue and McCall Street are within pedestrian benefit zone 16, as defined by Metro. Code § 17.04.060. To date, there are still no sidewalks on Mayes' side of McCall Street for several blocks in each direction of 167 McCall Street.

Plaintiffs' properties have not suffered a diminution in value because of the application of the Sidewalk Ordinance.

Pursuant to Metro. Code §§ 17.04.060 and 17.12.030, there is a minimum twenty-foot setback from the public right-of-way on the plaintiffs' properties that may not be obstructed except by permit.

The plaintiffs filed suit in October 2020, seeking a declaration that the Sidewalk Ordinance, by requiring them to pay for unrelated improvements to city property as a condition for the issuance of building permits for new homes, effects an unconstitutional "exaction" in violation of the

Takings Clause of the Fifth Amendment to the United States Constitution. (Doc. No. 1, at 20 ("Claim 1").) The plaintiffs also assert a claim against Metro under state law for unjust enrichment ("Claim 2") to recoup the in-lieu fee actually paid by Mayes.

Both parties, having completed discovery, now move for summary judgment; each motion is supported by a memorandum of law. (Doc. Nos. 18, 19, 21, 22.) Each opposes the other's motion (Doc. Nos. 26, 29), and both have filed reply briefs (Doc. Nos. 33, 35).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). In this situation, the court must "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

## III.     DISCUSSION

There are no material factual disputes, and each party's motion presents pure questions of law to be resolved by the court. The questions posed are (1) what standard of review applies to the consideration of whether the application of the Sidewalk Ordinance to the plaintiffs for a building permit constituted an uncompensated "taking"? And (2) under that standard, did a "taking" occur? The plaintiffs' Complaint and Motion for Summary Judgment also address the question of damages. However, because the court finds, as set forth below, that no taking occurred, the plaintiffs' claims for damages also fail.

### A.     Legal Backdrop: The Takings Clause

The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, *Dolan v. City of Tigard*, 512 U.S. 374, 383–84 (1994), states: "[N]or shall private property be taken for public use, without just compensation." The "paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). Originally, the Takings Clause was understood to apply only to such physical takings, until the Supreme Court recognized, in 1922, that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). The Court has repeatedly that stated there is no set formula for determining when a regulation goes "too far." *Lingle*, 544 U.S. at 537–38; *see also Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017) ("In the near century since *Mahon*, the Court for the most part has refrained from elaborating this principle through definitive rules.").

However, Supreme Court precedent establishes that a regulatory act that "requires an owner to suffer a permanent physical invasion of her property" or deprives an owner of "*all* economically beneficial us[e] of her property" will be deemed a *per se* taking. *Lingle*, 544 U.S. at 538 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (holding that a state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1020 (1992) (where the plaintiff's two beachfront lots had been "rendered valueless by respondent's enforcement of the coastal-zone construction ban," the landowner would be entitled to compensation).

Outside these two "relatively narrow categories" and "the special context of land-use exactions" (discussed below), *Lingle*, 544 U.S. at 538, regulatory takings challenges are governed by the standards set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104

(1978). In *Penn Central*, the Court identified "several factors that have particular significance" in evaluating regulatory takings claims, including (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) the "character of the governmental action"—for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* at 124, *quoted in Lingle*, 544 U.S. at 538.

"Land-use exactions" constitute a special category of regulatory takings, which the Court has addressed in a trio of holdings: *Dolan v. City of Tigard*, *supra*; *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987); and *Koontz v. St. John's River Water Management District*, 570 U.S. 595 (2013). In both *Nollan* and *Dolan*, the Court observed that, if a city or state government simply requires a property owner to dedicate a portion of her property for public use, without compensation, that would unambiguously be an unconstitutional taking. *Dolan*, 512 U.S. at 384; *Nollan*, 483 U.S. at 831. In each of those cases, rather than an outright taking of that sort, a governmental authority conditioned the issuance of a permit to build a house on the property on the property owners' agreement to dedicate a portion of their land to public use. In *Nollan*, the issuance of the permit was conditioned on the property owners' grant of a permanent public easement across their beachfront. 483 U.S. at 828. In *Dolan*, the issuance of a building permit was conditioned on the property owner's agreement to dedicate a portion of her property to improvement of a storm drainage system and to a pedestrian/bicycle path. *Dolan*, 512 U.S. at 380.

In both cases, the Court reaffirmed the principle that land use regulations are not unconstitutional takings, as long as they "substantially advance legitimate state interests" and do not "deny an owner economically viable use of his land." *Agins v. City of Tiburon*, 447 U.S. 255,

260 (1980), *abrogated by Lingle*, 544 U.S. at 544, *quoted in Dolan*, 512 U.S. at 385, *and Nollan*, 483 U.S. at 834.[7] The regulatory actions upheld as constitutional in the Court's previous decisions, unlike those in *Dolan* and *Nollan*, however, involved "essentially legislative determinations classifying entire areas of the city," and they imposed conditions that "were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city." *Dolan*, 512 U.S. at 385 (citations omitted).

In *Dolan* and *Nollan*, in contrast, the governmental body "made an adjudicative decision to condition [each] petitioner's application for a building permit on an individual parcel." *Id. Dolan* construed *Nollan* as extending the "well-settled doctrine of 'unconstitutional conditions'" to this type of governmental action, pursuant to which "the government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." *Id.* (citing *Perry v. Sindermann*, 408 U.S. 593, (1972); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). The Court held that the imposition of such conditions is not unconstitutional, so long as (1) there is an "essential nexus" between a "legitimate state interest" and the permit condition exacted by the city; *id.* at 386; and (2) there is a "rough proportionality" between the "exactions and the projected impact of the proposed development." *Id.* at 386, 391.

The "essential nexus" inquiry is a relatively low threshold, requiring only some logical connection between a legitimate governmental objective and the permit condition. *Id.* at 377–88.

---

[7] In *Lingle*, the Court held that the "substantially advance legitimate state interests" portion of the *Agins* test for assessing a regulation's viability was "doctrinally untenable as a takings test," insofar as it could be "read to demand heightened means-ends review of virtually any regulation of private property" and thus, to "require courts to scrutinize the efficacy of a vast array of state and federal regulations—a task for which courts are not well suited." *Lingle*, 544 U.S. at 544.

The "rough proportionality" prong of the test requires courts "to determine whether the degree of the exactions demanded by the city's permit conditions bears the required relationship to the projected impact of petitioner's proposed development." *Id.* at 388. This element of the test is more exacting, as it requires the governmental authority to "make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.* at 391.

In *Koontz*, more recently, the Court substantially extended the unconstitutional-conditions doctrine as developed in *Nollan* and *Dolan* to a situation in which the government denied a land-use permit, based on the landowner's refusal to comply with the imposed condition. *See Koontz*, 570 U.S. at 606 ("The principles that undergird our decisions in *Nollan* and *Dolan* do not change depending on whether the government approves a permit on the condition that the applicant turn over property or denies a permit because the applicant refuses to do so."). In *Koontz*, Florida law required applicants seeking permits to develop areas designated as wetlands to offset any resulting environmental damages. The landowner sought from the local Water Management District a building permit for vacant land that was technically designated as wetlands. He offered to offset the environmental effects of his development proposal by deeding to the Water Management District a conservation easement on almost three-quarters of his land. The District rejected his proposal and notified him that it would approve his permit request only if he reduced the size of his development even further and deeded a conservation easement to the District of the remainder of his property and, in addition, hired contractors to make improvements to District-owned wetlands several miles away. Rather than accepting this proposal, the landowner filed suit in federal court, alleging that the District's denial of a land use permit unless he agreed to fund offsite mitigation projects on public land constituted a taking without just compensation.

Although the Florida Supreme Court had "puzzled over how the government's demand for property can violate the Takings Clause even though 'no property of any kind was ever taken,'" the Court found that the unconstitutional conditions doctrine "provides a ready answer." *Id.* at 607. "Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation." *Id.* (citation omitted). The Court's analysis recognized that "in lieu of" fees are "utterly commonplace" and are "functionally equivalent to other types of land use exactions." *Id.* at 612. Accordingly, it held that "so-called 'monetary exactions' must satisfy the nexus and rough proportionality requirements of *Nollan* and *Dolan.*" *Id.*

The Sixth Circuit has recently applied *Koontz* to a situation that appears facially similar to the one presented in this case, but the decision left unanswered an important question regarding the type of case to which the unconstitutional conditions doctrine applies. In *F.P. Development, LLC v. Charter Township of Canton*, 16 F.4th 198 (6th Cir. Oct. 13, 2021), the plaintiff land-developer brought suit under 42 U.S.C. § 1983, alleging that a township ordinance that required the landowner to obtain permits and pay fees for the removal of trees from its property resulted in an unlawful taking in violation of the Fifth Amendment. The Sixth Circuit observed, in passing, that there was "an interesting question whether Canton's application of the Tree Ordinance falls into the category of government action covered by *Nollan*, *Dolan*, and *Koontz.*" *Id.* at 206. The parties, however, did not raise this "interesting question," and the court "decline[d] to do so on [its] own accord." *Id.* The parties instead stipulated that the case was governed by the unconstitutional conditions doctrine and subject to the *Nollan/Dolan* "essential nexus and rough proportionality test," so the court proceeded by applying that test to the facts before it. *Id.*

The "interesting question" has been raised by the parties in this case, however, and the question is this: whether a legislative, generally applicable development condition that applies to all new development within a certain geographic zone, as opposed to an adjudicative land-use exaction, should be addressed under the *Nollan/Dolan* framework. The Sixth Circuit has never addressed this question, and those courts that have done so have reached different conclusions. *Compare, e.g.*, *McClung v. City of Sumner*, 548 F.3d 1219, 1225, 1228 (9th Cir. 2008) (holding that a generally applicable city ordinance that required all new developments within the City of Sumner to install underground storm drain pipes that were at least twelve inches in diameter was subject to *Penn Central*'s analytic framework rather than to the *Nollan/Dolan* essential nexus and rough proportionality test and that "monetary exactions" were not subject to the *Nollan/Dolan* test), *abrogated in part by Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013), *with Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 641 (Tex. 2004) (where the court stated that it was "unconvinced" that the *Nollan/Dolan* standard applies only to adjudicative, as opposed to legislative, exactions).

### B. Which Standard of Review Applies

In support of its Motion for Summary Judgment, Metro argues that (1) the Sidewalk Ordinance is a "generally applicable land use regulation" rather than an *ad hoc* "exaction" (Doc. No. 22, at 9); (2) the land use regulation should be subjected to, and upheld under, a rational basis review; (3) even if the sidewalk ordinance is an "exaction," it is a legislative exaction rather than an adjudicative exaction, and, as such, it should be reviewed under a "deferential" "reasonable relationship" standard; and (4) alternatively, the Ordinance should be subject to the *Penn Central* test for regulatory takings. (Doc. No. 22, at 9.) The plaintiffs' Motion for Summary Judgment argues that the *Nollan/Dolan* standard applies and that the Sidewalk Ordinance cannot meet either

component of that test. In its Response to the plaintiffs' motion, Metro argues that, even if the *Nollan/Dolan* test applies, the Sidewalk Ordinance is not unconstitutional.

The court finds that: (1) there is no basis for applying a rational basis test; (2) the *Nollan/Dolan* test, as extended by *Koontz*, does not apply; (3) the *Penn Central* test for regulatory takings applies; and (4) under that test, no taking occurred, and, as a result, the plaintiffs are not entitled to damages or any other form of relief.

### 1.   *The Rational Basis Test Has No Application Here*

Metro's insistence that rational basis review applies to the plaintiffs' claims is puzzling. The plaintiffs bring suit for violation of the Takings Clause. Neither the Supreme Court nor the Sixth Circuit has ever applied the rational basis standard of review to a claim that a zoning ordinance gives rise to a regulatory taking in violation of the Takings Clause. The rational basis standard might apply, if, for example, the plaintiffs brought claims asserting that the Sidewalk Ordinance violates their right to substantive due process or equal protection, under the Fourteenth Amendment. *See, e.g.*, *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1223–24 (6th Cir. 1992) (applying rational basis standard to substantive due process challenge to a zoning ordinance); *Andrews v. City of Mentor*, 11 F.4th 462, 475 (6th Cir. 2021) (applying rational basis review to "class of one" equal protection challenge to denial of rezoning application); *see also Lingle*, 544 U.S. at 543–44 (rejecting the application of "due process precedents" to regulatory takings cases, as the inquiry in that context focuses on the burden imposed by regulation on private property rights). Such is not the case here, and the court rejects Metro's assertion that the plaintiffs' claims must be dismissed if the Sidewalk Ordinance simply bears a rational relationship to legitimate state interests. None of the opinions to which Metro cites holds to the contrary.

### 2.    *Nollan/Dolan Test Does Not Apply to a Legislative Land-Use Ordinance*

In *Dolan*, the Supreme Court specifically distinguished the facts of the case before it, in which the "city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel" and required that the plaintiff "deed portions of [her] property to the city," from those cases involving "essentially legislative determinations classifying entire areas of the city" and in which the "conditions imposed were . . . simply a limitation on the use petitioner might make of her own parcel." *Dolan*, 512 U.S. at 385; *see id.* at 391 n.8 ("Here, . . . the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel."). In *Koontz*, the Water Management District charged with reviewing and either granting or denying the landowner's building permit application also engaged in an adjudicative decision-making process; it had tremendous discretion to determine whether a proposed construction was "contrary to the public interest" and, if construction was permitted at all, to "impose 'such reasonable conditions' on the permit as are 'necessary to assure' that construction will 'not be harmful to the water resources of the district.'" *Koontz*, 570 U.S. at 601–02. *Koontz* thus extended the heightened scrutiny of *Nollan* and *Dolan* to monetary exactions applied in an *ad hoc*, individualized context.

Courts recognize that "adjudicative" zoning decisions are typically *ad hoc*, characterized by the exercise of discretion by the city or administrative body. Legislative actions, on the other hand, are characterized by "generally applicable legislation . . . that applies, without discretion or discrimination," to every property within the purview of the legislation. *San Remo Hotel L.P. v. City of San Francisco*, 41 P.3d 87, 104 (Cal. 2002). This distinction is drawn from the language in *Dolan* itself, quoted above. Although *Koontz* extended the *Nollan/Dolan* test to *ad hoc* monetary exactions, it left open the question of whether it applies to legislative exactions. As set forth above, the Sixth Circuit also has not addressed this question. *See F.P. Dev., LLC*, 16 F.4th at 206.

Numerous courts, however, have concluded that the *Nollan/Dolan* doctrine does not apply to generally applicable, legislatively imposed conditions. *See, e.g.*, *San Remo*, 41 P.3d at 105 ("The '*sine qua non*' for application of *Nollan/Dolan* scrutiny is thus the 'discretionary deployment of the police power' in 'the imposition of land-use conditions in individual cases.'" (quoting *Ehrlich v. City of Culver City*, 911 P.2d 429, 439 (Cal. 1996)).

In a pre-*Koontz* decision, the Ninth Circuit characterized *Nollan* and *Dolan* as "Fifth Amendment takings challenges to adjudicative land-use exactions—specifically, government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit." *Id.* at 1226 (quoting *Lingle*, 544 U.S. at 546). It further concluded that

> The facts of *Nollan* and *Dolan*—involving adjudicative, individual determinations conditioning permit approval on the grant of property rights to the public— distinguish them from the line of cases upholding general land use regulations. *Dolan*, 512 U.S. at 384–85. Unlike the facts of *Dolan*, cases questioning land use regulations "involve[] essentially legislative determinations classifying entire areas of the city" and placing limitations on the use owners may make of their property. *Id.* at 385. In comparison to legislative land determinations, the *Nollan/Dolan* framework applies to adjudicative land-use exactions where the "government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit." *Lingle*, 544 U.S. at 546. Indeed, the Supreme Court has recognized that it has "not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public use." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702 (1999).

*Id.* at 1227.[8] Concluding that the *Nollan/Dolan* framework is inapposite to "regulatory takings cases outside" that narrow context and that the facts of the case before it did not involve either "an

---

[8] Notably, again, *McClung* was issued before *Koontz* decided that monetary exactions, as well as the dedication of property, may fall within *Nollan* and *Dolan*, but *Koontz* would not have required a different outcome in *McClung*. *See Ballinger v. City of Oakland*, 398 F. Supp. 3d 560, 571 (N.D. Cal. 2019) (holding that *Koontz* did not overrule the central holding of *McClung*); *Bldg. Indus. Ass'n—Bay Area v. City of Oakland*, 289 F. Supp. 3d 1056, 1058 (N.D. Cal. 2018) (same, noting that *McClung* had "expressly stated that a development condition need only meet the

individual, adjudicative decision" or a "requirement that the [plaintiffs] relinquish rights in their real property," the court affirmed the district court's decision that the *Penn Central* analysis applied. *Id.* at 1229; *accord Anderson Creek Partners, L.P. v. Cty. of Harnett*, 854 S.E.2d 1, 3–4, 14–15 (N.C. Ct. App. 2020) (holding that a county ordinance pursuant to which the county charges landowners "capacity use" fees "for future water or sewer service as a mandatory condition" prior to issuing permits for developments to real property imposed a generally applicable, non-discretionary impact fee that was not subject to *Nollan/Dolan* test); *Dabbs v. Anne Arundel Cty.*, 182 A.3d 798, 810–11 (Md. 2018) ("The exactions concept protects citizens against abuses of power by land-use officials concerning proposed quasi-judicial or administrative action for permit or other development approvals relative to an individual parcel of land. There is no analogy to the *Koontz* scenario present here. The County's Development Impact Fee Ordinance is imposed broadly on all properties, within defined geographical districts, that may be proposed for development. The legislation leaves no discretion in the imposition or the calculation of the fee . . . ."); *Cal. Bldg. Indus. Ass'n v. City of San Jose*, 351 P.3d 974, 991 n.11 (Cal. 2015) (a post-*Koontz* case reaffirming pre-*Koontz* decisions holding "that legislatively prescribed monetary fees [of general application] that are imposed as a condition of development are not subject to the *Nollan/Dolan* test."). *But see Town of Flower Mound*, 135 S.W.3d at 641 (Tex. 2004) ("We are not convinced [that the *Dolan* standard applies only to 'adjudicative' decisions]. While we recognize that an *ad hoc* decision is more likely to constitute a taking than general legislation, we think it entirely possible that the government could 'gang up' on particular groups to force extractions that a majority of constituents would not only tolerate but applaud, so long as burdens

---

requirements of *Nollan* and *Dolan* if that condition is imposed as an 'individual, adjudicative decision'" (quoting *McClung*, 548 F.3d at 1227)).

they would otherwise bear were shifted to others. Nor are we convinced that a workable distinction can always be drawn between actions denominated adjudicative and legislative.").

Although the application of the Sidewalk Ordinance to Knight and Mayes in this case shares some features of the "adjudicative" actions at issue in *Nollan* and *Dolan*, insofar as it pertains to individual applicants for building permits and also appears to require the granting of a public right-of-way or easement along with the building of the sidewalk, the court nonetheless finds that the Sidewalk Ordinance is essentially "legislative," and its application does not require individualized, adjudicatory decisionmaking. The Sidewalk Ordinance applies broadly to all new development or substantial redevelopment in entire areas of Metropolitan Nashville; the amount to be paid into the in-lieu fund is set by a formula in the Ordinance itself and is not determined based on the particular development proposed; an administrative decision by the Board of Zoning Appeals does not impose the requirement to build sidewalks or to pay into the in-lieu fund—rather, the BZA can only remove the sidewalk requirement through the granting of a variance; and, finally, this structure is not unique to the Sidewalk Ordinance, as it is apparently consistent with many other land use regulations set out in Metro's Zoning Code, *see, e.g.*, Metro Code § 17.40.330 ("The metropolitan board of zoning appeals may grant variances from the strict application of the provisions of this Zoning Code based upon findings of fact related to the standards in this article.").

The court also concludes that the *Nollan/Dolan* standard of review is not applicable to the challenges to the constitutionality of the Sidewalk Ordinance and its application to the plaintiffs, insofar as that application constituted a legislative rather than adjudicative action. The Sidewalk Ordinance, as applied, does not pose a significant risk of abuse of power or overreaching by land-use officials, and, importantly, the in-lieu fee is capped at no more than three percent of the "total construction value of the permit." Metro. Code § 17.20-120(D)(1). In *Koontz*, the Supreme Court's

justification for extending the *Nollan/Dolan* test to monetary exactions was largely premised on two "realities" underlying the "permitting process," the first of which was that "land-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits," given the "special vulnerability of land use permit applicants to extortionate demands for money." *Koontz*, 570 U.S. at 604–05, 619. As at least one commentator has recognized, "that concern is greatly diminished in the context of legislative exactions because such exactions are less prone to 'leveraging' (*i.e.*, extortionate demands)." Glen Hansen, *Let's Be Reasonable: Why Neither Nollan/Dolan Nor Penn Central Should Govern Generally-Applied Legislative Exactions After Koontz*, 34 Pace Env't L. Rev. 237, 257–58 (2017) (hereafter, "Hansen"). In this case, given the general applicability of the Sidewalk Ordinance, the defined procedure for calculating the in-lieu fee, and the cap on that fee, the risk of an "extortionate" demand such as that made in *Koontz* simply does not exist.

The "second reality of the permitting process" with which the Supreme Court was concerned in *Koontz* is that "many proposed land uses threaten to impose costs on the public that dedications of property can offset." *Koontz*, 570 U.S. at 605. The plaintiffs here complain that the cost of sidewalks is being imposed upon them, as developers of property, when it should be borne by the public at large. The *Koontz* majority, however, "emphasized the individualized, property-specific nature of the exaction that falls within *Nollan/Dolan*," as distinct from regulations that "apply generally to parcels of land" and, as such, are akin to "property taxes, user fees, and similar laws and regulations." Hansen, 34 Pace Env't L. Rev. at 252 (quoting *Koontz*, 570 U.S. at 615). Although the plaintiffs' concerns are certainly understandable, the legislatively imposed Sidewalk Ordinance and alternative in-lieu fee are more in the nature of a tax or user fee than the "individualized, property-specific" exactions at issue in *Nollan*, *Dolan*, and *Koontz*. For this

reason, too, this court agrees with the numerous courts that have concluded that legislative "exactions" that apply generally, rather than only to specific parcels of real property, should not be governed by the *Nollan/Dolan* standard of review. Further, as the Ninth Circuit explained, "[t]o extend the *Nollan/Dolan* analysis here would subject any regulation governing development to higher scrutiny and raise the concern of judicial interference with the exercise of local government police powers." *McClung*, 548 F.3d at 1227–28.

In sum, the court finds that the Sidewalk Ordinance at issue here is a generally applicable land use regulation and that the *Nollan/Dolan* standard of review does not apply to generally applicable land use regulations, as opposed to adjudicative land-use exactions.

### 3. The Penn Central Test Applies

While recognizing, on the one hand, that the Sidewalk Ordinance falls within the scope of alleged regulatory takings subject to the balancing test established by *Penn Central*, Metro posits that the Sidewalk Ordinance should be subject to some "deferential," "reasonable relationship" standard of review. (Doc. No. 22, at 11.) In the alternative, it argues that the *Penn Central* test applies. (*Id.*) The only authority Metro offers for the application of a "reasonable relationship" standard of review comes from state court opinions and academic articles. This court, however, is bound by Sixth Circuit and Supreme Court precedent, both of which apply *Penn Central* to regulatory takings challenges that are not governed by the *Nollan/Dolan* standard. *See, e.g.*, *Lingle*, 544 U.S. at 538 ("Outside these two relatively narrow categories [*per se* takings and regulations that "completely deprive an owner of '*all* economically beneficial us[e]' of her property"] (and the special context of land-use exactions [governed by the *Nollan/Dolan* standard]), regulatory takings challenges are governed by the standards set forth in *Penn Central*[.]"); *Andrews v. City of Mentor*, 11 F.4th 462, 469 (6th Cir. 2021) (recognizing that *Penn Central* applies to regulatory takings that "allow[] for some economically beneficial use of the property in question"); *see also Mead v. City*

*of Cotati*, 389 F. App'x 637, 638 (6th Cir. 2010) ("A generally applicable development fee is not an adjudicative land-use exaction subject to the 'essential nexus' and 'rough proportionality' tests of [*Nollan* and *Dolan*]. Instead, the proper framework for analyzing whether such a fee constitutes a taking is the fact-specific inquiry developed [in Penn Central]."). The court finds that the *Penn Central* balancing test applies to the regulatory "takings" at issue here.

4.      *Applying Penn Central*

The plaintiffs make no effort to argue that the Sidewalk Ordinance, facially or as applied to them, would fail the *Penn Central* balancing test. Instead, they argue only that the appropriate standard is the *Nollan/Dolan* test and that the Sidewalk Ordinance cannot pass that test.

In that regard, the plaintiffs are likely correct. If the Sixth Circuit were to conclude that the *Nollan/Dolan* test applies to Metro's Sidewalk Ordinance, even assuming that Metro can satisfy the "essential nexus" component of the test, *see Dolan*, 512 U.S. at 387–88 (finding an essential nexus between the proposed bike and pedestrian path and the town's interest in removing vehicles from the street and improving traffic flow), Metro has not made the type of individualized assessment required to meet the "rough proportionality" component of the test. As the Sixth Circuit explained in *F.P. Development*, "[t]he 'required relationship' does not have to be 'exacting,' but it cannot be 'generalized,'" and the government authority "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development.'" *F.P. Dev., LLC*, 16 F.4th at 206 (quoting *Dolan*, 512 U.S. at 389–91). Although the BZA arguably considered Knight's and Mayes' individual circumstances in denying their requests for a variance, the basis for the decisions included such findings as that the establishment of a "connected pedestrian network via sidewalks and greenways" in Knight's neighborhood was "critical to planning goals," that Metro Water Services indicated that no hardship would prevent the construction of sidewalks on Knight's street, and that Knight's

property was near major thoroughfares and a newly built greenway. (*See* Doc. No. 26, at 9–10.) In both *Dolan* and *F.P. Development*, such generalized and conclusory findings were insufficient. *Dolan*, 512 U.S. at 389–91; *F.P. Dev.*, 16 F.4th at 206.

But the fact that Metro likely cannot meet the more stringent *Nollan/Dolan* test says nothing about whether it can satisfy *Penn Central*. As set forth above, *Penn Central* requires a balancing of several factors, including (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) the "character of the governmental action"—for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* at 124, *quoted in Lingle*, 544 U.S. at 538. The court construes the plaintiffs' failure to even address the *Penn Central* test as a concession that the Sidewalk Ordinance satisfies the test.

Further, a review of the record supports a conclusion that Metro easily satisfies *Penn Central*. There is no evidence that the economic impact of the Sidewalk Ordinance on the plaintiffs is substantial. As Metro argues, the costs imposed by the Sidewalk Ordinance, relative to the overall cost of the plaintiffs' construction projects, is minimal, as the in-lieu fee is capped at three percent of the "total construction value of the permit." Metro. Code § 17.20-120(D)(1). (Doc. No. 22, at 26.) Mayes' in-lieu fee ultimately amounted to 1.6% of his home's $550,000 appraised value. In the absence of argument or evidence to the contrary, this factor weighs in favor of finding that the Ordinance does not effect a taking.

In addition, there is no evidence that the Ordinance meaningfully interfered with the plaintiffs' "investment-backed expectations." It has long been accepted that sidewalks improve property values. Metro, in fact, points to a 175-year-old Tennessee Supreme Court decision

upholding a sidewalk ordinance and finding that sidewalks increase the value of property. *See Mayor v. Maberry*, 25 Tenn. 368, 373 (1845) ("A sidewalk well paved would therefore add greatly to the comfort of all who might pass that way, and the owners of the lots would share largely in the advantages it would afford. . . . The fact that these pavements exist must add to the value of property in that town, and in the general appreciation of property the plaintiff in error will derive a proportional advantage."). The plaintiffs concede that the Sidewalk Ordinance has not caused them to suffer a diminution in the value of their property. Moreover, the Sidewalk Ordinance, in some form, has been in effect since 2017 and was in effect prior to the plaintiffs' purchase of their respective properties. Metro also points out that the cost of compliance can be eliminated or reduced by two different variance procedures. The plaintiffs have not argued or presented evidence that the Sidewalk Ordinance interfered with their investment-backed expectations. Accordingly, this factor weighs in favor of Metro as well.

The plaintiffs also do not refute Metro's contention that sidewalks, as stated in the Sidewalk Ordinance, benefit the city of Nashville, its residents, and individual property owners and enhances the value, desirability, and safety of the plaintiffs' properties and neighborhoods. As such, the Sidewalk Ordinance falls within the category of a "public program adjusting the benefits and burdens of economic life to promote the common good." (Doc. No. 22, at 28.) While it must be acknowledged that the presence of a sidewalk would qualify as a physical invasion of the plaintiffs' properties, the plaintiffs do not actually contest the building of sidewalks on their properties. Rather, they contest the requirement that they pay the in-lieu fee into the sidewalk fund, which goes toward building sidewalks elsewhere in the city. Even if sidewalks were to be built on their properties, Metro also points out that the city has a setback ordinance prohibiting development without a permit within a twenty-foot buffer zone alongside the road, as a result of which the

plaintiffs cannot use that strip for development anyway. As a result, the Sidewalk Ordinance as applied to the plaintiffs does not change the use of their properties or unduly restrict their rights of use.

In light of Metro's arguments and the plaintiffs' failure to refute them, the court finds, in weighing the *Penn Central* factors, that the Sidewalk Ordinance does not effect an unconstitutional taking without compensation. Metro, therefore, is entitled to summary judgment on the plaintiffs' claim that they were subjected to unconstitutional takings without just compensation.

### C. The Plaintiffs' Claims for Damages

Mayes brings a state-law unjust enrichment claim seeking restitution of the in-lieu fee he already paid. This claim is premised upon the assertion that, through the enforcement of the Sidewalk Ordinance, Metro acquired funds from Mayes through an unconstitutional exaction. (Complaint, Doc. No. 1 ¶¶ 157–58.) Because the court has found that Metro is entitled to summary judgment on the plaintiffs' takings claims, Mayes' unjust enrichment claim also fails, and Metro is entitled to summary judgment on this claim as well.

## IV. CONCLUSION

For the reasons set forth herein, the court will grant Metro's Motion for Summary Judgment and deny the plaintiffs'. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge